James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Counsel for Plaintiffs and the putative Class*

[*Additional Attorneys on Signature Page*]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRANDON FLORES, ERMA FLORES, and REZA ABOLFATHIAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VERISK ANALYTICS, INC. and HYUNDAI MOTOR AMERICA,<br><br>Defendants. | Civil Action No.: 2:24-cv-07800-JKS-AME<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Brandon Flores, Erma Flores, and Reza Abolfathian ("Plaintiffs") complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters against Defendants Hyundai Motor America ("Hyundai") and Verisk Analytics, Inc. ("Verisk") (collectively, "Defendants"), as follows:

## SUMMARY OF ALLEGATIONS

1. For many consumers, "[a] car, to its driver, can feel like a sanctuary. A place to sing favorite songs off key, to cry, to vent, or to drive somewhere no one knows you're going."[1]

2. But contrary to consumers' expectations, modern cars are instead "surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside -- even where and when we do it."[2]

3. Defendant Hyundai has long manufactured and sold consumer vehicles in the United States and around the world, selling well known models such as the Tucson, Elantra, Santa Fe, and Sonata. The sale of these vehicles to consumers has historically constituted the bulk of Hyundai's profits.

4. As cars have increasingly become "computers on wheels" equipped with advanced software and GPS tracking, however, Hyundai has found an additional way to profit from consumers: their driving data.

5. Specifically, Hyundai has deceived consumers like Plaintiffs into sharing a wide array of their driving data, including location data, under the guise of improving users' driving safety—and then selling that data to third parties like Verisk for millions of dollars a year. Hyundai engages in this practice despite an array of accuracy issues in the data it collects.

6. Verisk then sells this unreliable and decontextualized driving data to insurance companies—who in turn use the data to substantially increase consumers' auto insurance rates.

---

[1] Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. Times (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

[2] Jen Caltrider et al., *After Researching Cars and Privacy, Here's What Keeps Us Up at Night*, Privacy Not Included (Sept. 6, 2023), https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/.

7. Plaintiffs are two of the millions of Hyundai users whose driving data was collected and exploited by Defendants without their full knowledge and consent, and Plaintiffs have suffered significantly higher insurance rates as a result.

8. Plaintiffs bring this action on behalf of themselves and members of the Classes (defined below) for statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained, injunctive relief, and all other just and proper relief on behalf of all persons whose driving data was unlawfully captured, stored, and/or transferred or sold by Defendants without full notice or consent.

## PARTIES

9. Plaintiff Erma Flores is a natural person and citizen of the State of California and a resident of Sacramento County, where she intends to stay. Plaintiff Erma Flores has owned a 2023 Hyundai Elantra since September 2022.

10. Plaintiff Brandon Flores is a natural person and citizen of the State of California and a resident of Sacramento County, where he intends to stay. Plaintiff Brandon Flores has driven a 2023 Hyundai Elantra since September 2022.

11. Plaintiff Reza Albofathian is a natural person and citizen of the State of California and a resident of Orange County, where he intends to stay. Plaintiff Albofathian has leased a 2021 Hyundai Nexo since December 2021.

12. Defendant Hyundai Motor America is a United States corporation with its principal place of business in Fountain Valley, California, and incorporated under the laws of California. In addition to its Fountain Valley headquarters, Hyundai designs all vehicles for the U.S. market in its 90,000 square foot Design & Technical Center in Irvine, California. Hyundai Motor America operates as the North American subsidiary of South Korea-based Hyundai Motor Company.

13. Defendant Verisk Analytics, Inc. is a United States corporation headquartered in Jersey City, New Jersey, and incorporated under the laws of Delaware. According to Verisk's 2023 Form 10-K filed with the U.S. Securities and Exchange Commission, Verisk's New Jersey headquarters occupy more square footage than the rest of its other two U.S. offices combined.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the Classes are citizens of states different from some Defendants.

15. This Court has general personal jurisdiction over Verisk because Verisk is at home and headquartered in the State of New Jersey. Even if the Court did not have general personal jurisdiction, Verisk has sufficient minimum contacts with this District, and has purposefully availed itself of the privilege of doing business in this District, such that it could reasonably foresee litigation being brought in this District. Verisk is therefore also subject to specific jurisdiction in this District.

16. The Court has specific personal jurisdiction over Hyundai because Hyundai has affirmatively established and maintained sufficient contacts with New Jersey and conducts significant business in this State. Specifically, Hyundai targeted its goods and services to New Jersey, as Hyundai markets and sells vehicles equipped with the telematics equipment at issue in this complaint through the State of New Jersey. Further, the telematics data that Hyundai vehicles collect and transmit, including Plaintiffs' data, is and was ultimately sent to Verisk, in New Jersey, and the claims and harm alleged herein specifically arise from those activities. Finally, Hyundai's Eastern Region office is located in Monroe Township, New Jersey. The Eastern Regional Office oversees most aspects of Hyundai vehicle sales in the Northeastern U.S., works directly with

Hyundai retailers across the region on sales and service, and also oversees consumer affairs in the Eastern Region.

17. The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens of California while they were located within California. At all relevant times, Defendants targeted their goods and services to California citizens, and knew that their practices would directly result in collection of information from California citizens while those citizens operate vehicles in California. Defendants chose to avail themselves of the business opportunities of marketing and selling their goods and services in California and collecting real-time data from California drivers while driving within the state, and the claims and harm alleged herein specifically arise from those activities.

18. This Court is also the proper venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

***Hyundai, Bluelink, and "Hyundai Drive Score"***

19. Hyundai is one of the top ten auto manufacturers in the United States, selling over 800,000 vehicles nationwide in 2023 alone.[3]

20. In 2011, Hyundai launched Bluelink, which they advertised as "an all-new telematics and connected car platform exclusive to Hyundai models."[4]

21. "Telematics" is a combination of "telecommunication" and "informatics," and describes services that provide information about a portable device via telecommunications

---

[3] *Hyundai Motor America Reports Record-Breaking December, Q4 and 2023 Sales*, Hyundai Media Center (January 3, 2024), https://www.hyundainews.com/en-us/releases/4037.

[4] *Hyundai Launches All-New Blue Link Telematics Platform*, Hyundai Media Center (January 5, 2011), https://www.hyundainews.com/en-us/releases/2251.

networks. Today telematics often describes vehicle systems that combine Global Positioning System ("GPS") and cellular technologies with onboard electronics. They can include safety, communication, vehicle diagnostic and entertainment features.

22. When launched, Bluelink was advertised as having "more than 30 unique connectivity features" on the models it was to be released on.[5] Such features included "Eco-Coach," which was designed to improve efficient driving, and location sharing, which allowed drivers to send the location of the vehicle to friends and members of social media sites directly from the vehicle.[6]

23. Over the course of Bluelink's development, new features were incrementally added, such as the vehicle safeguard alerts in-vehicle app, the "Bluelink 3.0" mobile application, and smart watch applications.[7] Upon reaching their fifth-year anniversary, Hyundai announced that, since its launch, Bluelink had handled over 90,000,000 requests from customers using the system.[8]

24. While Bluelink charged an annual fee upon its introduction, since 2017 all purchases of a Hyundai vehicle have come with three complimentary years of Bluelink service, after which vehicle owners would be charged an annual fee for the service.[9] In 2023, Hyundai announced that new models would come with "Bluelink+," which offered many of the same

---

[5] *Id.*
[6] *Id.*
[7] *Hyundai Blue Link Celebrates its Fifth Anniversary*, Hyundai Media Center (June 29, 2016), https://www.hyundainews.com/en-us/releases/2243.
[8] *Id.*
[9] *Hyundai Makes Remote Services Standard on Blue Link-Equipped Ioniq and 2018 Models*, Hyundai Media Center (April 13, 2017), https://www.hyundainews.com/en-us/releases/2337.

Bluelink services offered previously, but would not incur any recurring subscription fees after the three-year trial period.[10]

25. Among the various services offered by Hyundai through Bluelink was Hyundai Drive Score (then called "Driving Score"), which was introduced in 2020 and provided insights into drivers' driving behavior. Drive Score was formally launched in 2020 after Hyundai and Verisk had entered into a partnership for the purpose of sharing and analyzing driver data in 2018.[11]

26. When released, Drive Score was advertised as a product that would promote safe and efficient driving habits.[12] It was also touted as a way for drivers to opt into sharing their driving behaviors with insurance companies in order to obtain discounts and lower insurance premiums.[13]

27. Drive Score utilized Verisk's analytics and the insights that Verisk claimed correlated with insurance losses, including "smooth driving, speed responsibility, driving time of day, consistent driving and time behind the wheel."[14]

28. On a weekly basis, Drive Score would record and analyze driving data and assign a score to a driver, ranging from 0-100, with 0 being the worst score possible.[15] Drive Score would also provide tips to the driver about ways that they could improve their driving, such as by braking more smoothly, spending less time driving late at night, and accelerating more gently.[16]

---

[10] *Hyundai Launches BlueLink+*, Hyundai Media Center (Feb. 9, 2023), https://www.hyundainews.com/en-us/releases/3761.

[11] *New Usage-Based Insurance and Driving Score Help Hyundai Customers Save Money*, Hyundai Media Center (March 29, 2020), https://www.hyundainews.com/en-us/releases/3281; *Hyundai Joins the Verisk Data Exchange*, Verisk (Apr. 17, 2018), https://www.verisk.com/company/newsroom/hyundai-joins-the-verisk-data-exchange/.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

29. The Drive Score feature did not only collect driving information regarding a Hyundai vehicle's primary owner or leaseholder. Hyundai vehicle owners or leaseholders can add several additional or secondary driver profiles to their vehicles and Bluelink accounts.[17] Upon information and belief, this feature allowed Hyundai to collect and sell driving data of non-owner or non-leaseholder drivers, as well.

30. While customers could opt out of Bluelink services—and therefore opt out of sharing driving data with third parties like Verisk—anyone opting out of Bluelink would lose access to an array of other features, including Remote Start with Climate Control, Remote Door Lock/Unlock, Car Finder, Enhanced Roadside Assistance, and Stolen Vehicle Recovery.[18]

***Hyundai Sells Driving Data Verisk, Who in Turn Sells Individualized Data to Insurance Companies***

31. Despite pitching Drive Score as a service for Hyundai drivers to improve their driving and increase safety, Hyundai's main purpose in collecting customers' driving data was to sell that data for Hyundai's own financial gain.

32. Since Drive Score was introduced, Hyundai has bundled consumers' driving data—their driving scores, their location data, how much they are driving, and *every single instance* that a driver engages in hard braking, fast acceleration, high speed driving, and late night driving—and marketed that data to consumer risk analysis companies like Verisk.

[17] *Adding a Secondary Driver*, Hyundai Owner Resources, https://owners.hyundaiusa.com/us/en/resources/blue-link/adding-a-secondary-driver.
[18] *New Usage-Based Insurance and Driving Score Help Hyundai Customers Save Money*, Hyundai Media Center (March 29, 2020), https://www.hyundainews.com/en-us/releases/3281.

33. This bundling is unsurprising, given the substantial profit that can be made in the vehicle telematics market, which was estimated to be worth nearly $73 billion in 2022.[19]

34. Indeed, Verisk alone has built a sprawling system of partnerships to purchase telematics data for millions of drivers from a wide array of manufacturers, including Hyundai.[20]

35. Verisk's efforts began in 2015, when Verisk announced the creation of a "Verisk Telematics Data Exchange," which would allow manufacturers to share vehicle telematics data with insurance companies.[21] At the time, Verisk's only manufacturer partner was General Motors (GM).

36. Since 2015, Verisk's partnerships have expanded to include Ford, Honda, and Hyundai, among other automotive manufacturers.[22]

37. Hyundai partnered with Verisk starting in 2018, when Verisk announced an exclusive agreement between Verisk and Hyundai whereby Hyundai would sell Verisk the driving data of Hyundai drivers who participated in its connected car programs.[23]

---

[19] *Vehicle Telematics Market Size Worth USD 280.78 billion, Globally, by 2030 at a CAGR of 18.5%,* Yahoo! Finance, https://finance.yahoo.com/news/vehicle-telematics-market-size-worth-100500255.html

[20] Hill, *supra* note 1.

[21] *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, Verisk (Sept. 2, 2015), https://www.verisk.com/company/newsroom/archive/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-join-telematics-data-exchange/.

[22] *Ford and Verisk Collaborate to Offer Telematics Data to Insurers*, Verisk (October 13, 2020), https://www.verisk.com/company/newsroom/ford-and-verisk-collaborate-to-offer-telematics-data-to-insurers/; *Verisk Telematics Data Integration with Honda Now Live, Providing New Opportunities for Usage-Based Insurance Innovation*, Verisk (August 6, 2020), https://www.verisk.com/company/newsroom/verisk-telematics-data-integration-with-honda-now-live-providing-new-opportunities-for-usage-based-insurance-innovation/; *Hyundai Joins the Verisk Data Exchange*, Verisk (April 17, 2018), https://www.verisk.com/company/newsroom/hyundai-joins-the-verisk-data-exchange/.

[23] *Hyundai Joins the Verisk Data Exchange*, Verisk (April 17, 2018), https://www.verisk.com/company/newsroom/hyundai-joins-the-verisk-data-exchange/.

38. On information and belief, Hyundai uses in-car telematics equipment to intercept data about consumers' driving behavior and their location data from a given vehicle's on-board computer, transmits this data to a server, and then compiles and sells consumers' data in bulk to the Verisk Telematics Data Exchange.

***Drivers Face Increased Insurance Rates Due to Hyundai Sharing Their Driving Data***

39. When risk analysis companies like Verisk receive individualized driving data from a manufacturer like Hyundai, that data is then used to generate scores and attributes that are more easily ingested into insurance workflows to help better assess risk. Through Verisk, "[a]uto insurers . . . have expanded access to connected-car data in an easily usable format . . . ."[24]

40. Having access to such a vast and detailed set of driving data and location data allows insurers to know far more than they ever have about the driving behavior of the insured—and consequently, price their customers' rates accordingly.

41. Verisk boasts about the likelihood of rate hikes when insurers purchase data compiled from manufacturers like Hyundai, promising insurers that though "accurate risk selection, classification, and segmentation," they can help "unlock profitability."[25]

42. Verisk promises that its product "uses advanced analytics to transform raw trip and sensor data into insurance-ready insights," and compiles "rich, trip-level data from millions of vehicles . . . to give insurers purpose-built access to risk insights that support superior decision-making across the policy life cycle."[26]

---

[24] *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, *supra* note 23.

[25] *Risk Selection and Underwriting*, Verisk, https://www.verisk.com/solutions/underwriting-rating/personal-auto/risk-selection-underwriting/ (last visited June 11, 2024).

[26] Michelle Pantina, *Verisk Remains Hyundai's Exclusive Provider of Telematics Data to Insurers*, Globe Newswire (Feb. 9, 2023), https://www.globenewswire.com/en/news-release/2023/02/09/2605077/0/en/Verisk-Remains-Hyundai-s-Exclusive-Provider-of-Telematics-Data-to-Insurers.html.

43. Hyundai vehicle owners and lease owners across the country—many of whom have never had a traffic violation or accident—are now facing drastically increased insurance rates as a result of Hyundai's and other manufacturers' undisclosed sharing of their data with Verisk and insurers, and even facing difficulty finding any insurance at all.

44. Recent reporting on General Motors' selling of driver data to LexisNexis and Verisk illuminates the substantial insurance rate hikes that drivers like Plaintiffs and Class Members face when vehicle manufacturers sell their data. For example, a GM vehicle owner in Seattle, Washington, has never been responsible for an accident, and his insurance rates have long been stable as a result. But in 2022, his car insurance jumped nearly twenty-one (21) percent due to an extensive 258-page driving report that his car's Smart Driver service had reported to LexisNexis, detailing 640 different trips he had taken in his Chevrolet vehicle.[27] Similarly, a different GM vehicle owner in Palm Beach County, Florida, had no issues finding affordable insurance for years. But after purchasing a new GM vehicle, he was denied auto insurance by seven different insurance companies. When he finally found car insurance through a private insurance broker, his rate was nearly twice what he previously paid per month.[28]

45. The data that Drive Score collects from users is also decontextualized, ignoring the ways that vehicle owners can safely operate their vehicles at high speeds, late at night, and other supposedly negative driving behaviors.

46. Indeed, despite these real-world consequences of data from Drive Score and similar programs being shared with third parties such as Verisk and insurers, the underlying data is

---

[27] Hill, *supra* note 1.
[28] *Id.*

fundamentally flawed, and in some cases is simply wrong or inaccurate about drivers' safe driving behavior.[29]

47. For example, in large portions of the western United States, 80 mph is the standard speed limit on interstate highways,[30] but a driver operating their vehicle at those speeds will automatically be penalized under the "speed responsibility" metric tracked by Drive Score.

48. Alternatively, when a driver encounters a child or animal suddenly entering the roadway, sudden braking is the appropriate defensive driving response in that scenario, but that driver will automatically be penalized under the "smooth driving" metric tracked by Drive Score.

49. Without this context, the data that Hyundai sells to third parties, including Verisk, is misleading, inaccurate, bears little relationship to a Hyundai owner's or lessee's actual safe driving abilities.

***Drivers Never Consent to Sale of Their Driving Data, and Rely on Hyundai's Promises That Hyundai Will Not Sell Their Driving Data***

50. Hyundai engages in these data sharing practices despite *never* disclosing that it would share drivers' data with these types of organizations in its privacy policies, terms and conditions of service, or other documents and webpages presented to customers, which precludes drivers from having any meaningful consent to the sharing of their data.

51. The Hyundai Motor America Privacy Policy (the "Hyundai Privacy Policy"), for example, explains that Hyundai does "collect and derive personal information through our Vehicle Technologies and Services, including information about you and your vehicle, as well as other

---

[29] Jason Torchinsky, *Carmakers Are Sneakily Sharing Your Driving Data with Insurance Companies but What's Worse Is That the Data Is Crap*, Autopian (Mar. 19, 2024), https://www.theautopian.com/carmakers-are-sneakily-sharing-your-driving-data-with-insurance-companies-but-whats-worse-is-that-the-data-is-crap/.

[30] *State Speed Limit Chart*, Nat'l Motorist Ass'n, available at https://ww2.motorists.org/issues/speed-limits/state-chart/ (last accessed May 11, 2024).

users of your vehicle and the Services, such as vehicle usage and performance data, driving data, geolocation data, settings and presets, and features and services accessed and used."[31]

52. The Hyundai Privacy Policy also describes third parties that Hyundai may disclose this data to, including car dealerships, marketing and promotional partners, other companies involved in mergers and acquisition with Hyundai, and entities that Hyundai must disclose this information to in order to comply with legal or regulatory obligations.[32]

53. Despite this list of potential entities to which Hyundai may disclose data collected from its drivers, nowhere in the Hyundai Privacy Policy does Hyundai mention that it may sell drivers' confidential driving data to third-party risk entities or insurance companies.[33]

54. Indeed, in the California Privacy Supplement included at the end of the Hyundai Privacy Policy, Hyundai specifically promises that "We do not sell or share sensitive personal information."[34]

55. Hyundai's Vehicle Technologies and Services Privacy Policy (the "Technology Privacy Policy") similarly provides information about "how we collect, use, disclose, and otherwise process the personal information related to the [Hyundai] Bluelink connected services and other vehicle technologies and services."[35]

56. The Technology Privacy Policy specifically acknowledges that Hyundai, via Bluelink, may collect "vehicle, performance and driving data, and precise geolocation," as well as other information, in order to "operate, analyze and improve Vehicles and the Vehicle

---

[31] Hyundai Motor America Privacy Policy, Hyundai (Dec. 14, 2023), https://www.hyundaiusa.com/us/en/vehicle-technologies-services-privacy.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] Vehicle Technologies and Services Privacy Policy, Hyundai (Jan. 1, 2023), https://www.hyundaiusa.com/us/en/vehicle-technologies-services-privacy.

Technologies and Services and to reach users relevant information and personalized offers, alerts and updates," such as driving feedback through Drive Score.[36]

57. The Technology Privacy Policy further describes third parties that Hyundai may disclose this data to, including car dealerships, marketing and promotional partners, other companies involved in mergers and acquisition with Hyundai, and entities that Hyundai must disclose this information to in order to comply with legal or regulatory obligations.[37]

58. Despite this list of potential entities to which Hyundai may disclose data collected via Bluelink, nowhere in the Technology Privacy Policy does Hyundai mention third-party risk entities nor insurance companies.

59. Upon information and belief, neither the Hyundai Privacy Policy nor the Technology Privacy Policy, as well as similar terms of service for Hyundai vehicles and Bluelink, were presented to drivers before they started operating their vehicles and using Bluelink, or alternatively were not presented in an obvious and reasonable manner.

60. Moreover, the language of the privacy policies was deceptive and misleading, and obscured Hyundai's intent to sell driving data to Verisk from Hyundai drivers.

61. Even if customers could navigate to these policies and infer Hyundai's true intent to package and sell their data from this language, the structure of Bluelink incentivized Hyundai customers to keep Bluelink and Drive Score turned on thus allowing Hyundai and its third-party data partners to continue collecting drivers' behavioral data.

***Plaintiff Erma Flores Has Faced Significant Financial Consequences due to Defendants' Sharing of Her Data Without Her Consent***

62. Plaintiff Erma Flores purchased a new 2023 Hyundai Elantra in September 2022.

[36] *Id.*
[37] *Id.*

63. When Mrs. Flores purchased her Elantra, the vehicle was already equipped with Bluelink, including the Drive Score service. Upon information and belief, the Bluelink on Mrs. Flores vehicle was activated by Hyundai prior to her purchase of the vehicle.

64. After purchasing her Elantra, Mrs. Flores downloaded the Bluelink app, as recommended by Hyundai. Mrs. Flores does not recall setting up any features during the setup of her Bluelink app, beyond what Hyundai already activated on her vehicle.

65. Mrs. Flores also does not recall viewing any privacy policies or terms and conditions while setting up her Bluelink app, nor does she recall viewing any such documents while using her car's infotainment system.

66. Even if Mrs. Flores had been presented with or given sufficient notice about any of these documents during the signup process, these terms would have never clearly alerted her that the Bluelink service would collect and share her driving data with data brokers like Verisk, let alone her insurance company.

67. Three months after Plaintiff Flores purchased her new Hyundai vehicle, she switched her joint auto insurance coverage with her husband, Plaintiff Brandon Flores, from GEICO to State Farm. The Flores' initial State Farm rate was $250 per month. After one month of coverage, however, the price of their insurance shot up to $350 per month, a 40% increase compared to their original rate.

68. Several months later, in January of 2024, the price of the Flores' insurance increased again to $425 per month, a 70% increase compared to their original rate.

69. When Mrs. Flores' husband, Plaintiff Brandon Flores, contacted State Farm about the dramatic spike in their monthly rate, the Flores learned that State Farm knew several details about her driving history, including the exact mileage on the Flores' Elantra. Upon information

and belief, State Farm acquired this information about the Flores' vehicle through Hyundai's partnership with Verisk.

70. Mrs. Flores has no accidents or incidents on her record, nor has she submitted any insurance claims that would explain the increase in her auto insurance rates. Upon information and belief, Mrs. Flores' insurance hikes were the direct and proximate results of Hyundai sharing her driving data with Verisk, and Verisk's packaging and sale of that data to State Farm.

***Plaintiff Brandon Flores Has Faced Significant Financial Consequences due to Defendants' Sharing of Her Data Without Her Consent***

71. Plaintiff Brandon Flores' wife, Plaintiff Erma Flores, purchased a new 2023 Hyundai Elantra in September 2022.

72. While Mr. Flores' wife is the sole owner of the Elantra, both Mr. and Mrs. Flores drive the Elantra, the insurance for the Elantra is in both Mr. and Mrs. Flores' names, and both Mr. and Mrs. Flores pay for their insurance from a joint financial account.

73. When Mr. Flores's wife purchased the Elantra, the vehicle was already equipped with Bluelink, including the Drive Score service. Upon information and belief, the Bluelink on the Flores' vehicle was activated by Hyundai prior to his wife's purchase of the vehicle.

74. Mr. Flores subsequently downloaded the Bluelink app, as recommended by Hyundai. Mr. Flores does not recall setting up any features during the setup of his Bluelink app, beyond what Hyundai already activated on his vehicle. Mr. Flores believes his Bluelink app is set up as a secondary driver for the Flores' Hyundai.

75. Plaintiff Brandon Flores also does not recall viewing any privacy policies or terms and conditions while setting up his Bluelink app, nor does he recall viewing any such documents while using the car's infotainment system.

76. Even if Plaintiff Flores had been presented with or given sufficient notice about any of these documents during the signup process, these terms would have never clearly alerted him that the Bluelink and Drive Score service would collect and share his driving data with data brokers like Verisk, let alone his insurance company.

77. Three months after the Flores acquired their new Hyundai vehicle, Mr. and Mrs. Flores switched their joint auto insurance coverage from GEICO to State Farm. The Flores' initial State Farm rate was $250 per month. After one month of coverage, however, the price of their insurance shot up to $350 per month, a 40% increase compared to their original rate.

78. Several months later, in January of 2024, the price of the Flores' insurance increased again to $425 per month, a 70% increase compared to their original rate.

79. When Mr. Flores contacted State Farm about the dramatic spike in their monthly rate, he was informed that the rates were merely subject to a "blanket increase." During the call, however, Mr. Flores learned that State Farm knew several details about his driving history, including the exact mileage on the Flores' Elantra. Upon information and belief, State Farm acquired this information about the Flores' vehicle through Hyundai's partnership with Verisk.

80. Plaintiff Flores has no accidents or incidents on his record, nor has he submitted any insurance claims that would explain the increase in his auto insurance rates. Upon information and belief, Mr. Flores' insurance hikes were the direct and proximate results of Hyundai sharing his driving data with Verisk, and Verisk's packaging and sale of that data to State Farm.

***Plaintiff Albofathian Has Faced Significant Financial Consequences due to Defendants' Sharing of His Data Without His Consent***

81. Plaintiff Albofathian leased a new 2021 Hyundai Nexo in December of 2021.

82. When Plaintiff Albofathian started leasing his Nexo, the vehicle was already equipped with Bluelink, including the Drive Score service. Upon information and belief, the

Bluelink on Plaintiff Albofathian's vehicle was activated by Hyundai prior to his purchase of the car.

83. Plaintiff Albofathian does not recall viewing any privacy policies or terms and conditions when he initiated his lease, nor does he recall viewing any such documents while using his car's infotainment system.

84. Even if Plaintiff Albofathian had been presented with or given sufficient notice about any of these documents during the signup process, these terms would have never clearly alerted him that the Bluelink service would collect and share his driving data with data brokers like Verisk, let alone his insurance company.

85. Prior to leasing his Hyundai, Plaintiff Albofathian drove a recent-model Toyota Mirai, which he insured for approximately $95 per month through Costco Auto Insurance. Several months after switching to his Hyundai Nexo, however, Plaintiff Albofathian's insurance rates had risen to nearly $170 per month, at nearly 80% increase compared to his original rate.

86. Plaintiff Albofathian has no accidents or incidents on his record, nor has he submitted any insurance claims that would explain the increase in his auto insurance rates. Upon information and belief, Plaintiff Albofathian's insurance hikes were the direct and proximate results of Hyundai sharing his driving data with Verisk, and Verisk's packaging and sale of that data to Costco.

## FRAUDULENT CONCEALMENT AND TOLLING

87. The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct—through, among other things, deceptive language and practices directed at consumers during the registration process for Bluelink and Drive Score, misleading public statements, and hidden and ambiguous privacy policies and terms of use.

Plaintiffs and the Classes were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

88. Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs and the Classes. Defendants are therefore estopped from relying on any statute of limitations.

89. Defendants' fraudulent concealment is common to the Classes.

## CLASS ACTION ALLEGATIONS

90. Plaintiffs bring this action, individually, and on behalf of a class and subclass of similarly situated persons, pursuant to Fed. R. Civ. P. 23, defined as follows:

> **Nationwide Class**
>
> All persons residing in the United States during the relevant class period that owned, leased, or drove a Hyundai vehicle and whose driving data was collected and shared with a third party without their consent.
>
> **California Subclass**
>
> All persons residing in California during the relevant class period that owned, leased, or drove a Hyundai vehicle and whose driving data was collected and shared with a third party without their consent (the "California Subclass").[38]

91. Excluded from the Class and California Subclass (collectively, the "Classes") are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated

[38] Plaintiffs reserve the right to modify or refine the definition of the Classes.

on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

92. **Ascertainability**. The Classes are readily ascertainable because they are defined using objective criteria and Class members can be readily identified through records maintained by Defendants.

93. **Numerosity**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of Class members, as herein identified and described, is not known, but publicly available information reveals that there are millions of Hyundai vehicles in the United States. California makes up roughly 12% of the nation's population and is believed to be home to a disproportionate number of Hyundai customers relative to other states.

94. **Commonality**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

a. whether Defendants engaged in the activities and practices referenced above;

b. whether Defendants' activities and practices constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. Code § 502;

c. whether Defendants' activities and practices constitute an intrusion upon seclusion;

d. whether Defendants' activities and practices constitute a violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL");

e. whether Defendants' activities and practices constitute a violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*. ("FAL");

f. whether Defendants violated the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*. ("CCPA") by collecting, using, and selling personal information without providing consumers with notice;

g. whether Defendants' activities and practices constitute breach of contract;

h. whether Defendants' activities and data collection practices constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

i. whether Plaintiffs and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices, and, if so, in what amount;

j. whether Defendants were unjustly enriched from their wrongful activities and practices, and, if so, in what amount;

k. what is the appropriate injunctive relief to ensure that Defendants no longer unlawfully collect and sell data about Plaintiffs' and Class members' driving behavior; and

l. what is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully-acquired driver data in their possession, custody or control.

95. **Typicality**. Plaintiffs' claims are typical of the claims of members of the Classes because, among other things, Plaintiffs and members of the Classes sustained similar injuries as a

result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants. Further, all Class members were subject to the collection of their driving data through Drive Score. Likewise, Defendants' misconduct impacted all Class members in the same manner.

96. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of the Class members, and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Classes.

97. **Predominance & Superiority**. Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

98. **Final Declaratory or Injunctive Relief**. Defendants have acted or refused to act on grounds that apply generally to the Classes, making final declaratory and/or injunctive relief appropriate with respect to the Classes as a whole.

99. **Particular Issues**. The claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation. These issues include but are not limited to:

a. whether Defendants unlawfully collected driving data from consumers;

b. whether Defendants adequately disclosed their data collection practices to consumers;

c. whether Defendants used dark patterns or deceptive practices to gain access to consumers' driving data as alleged herein;

d. whether Defendants breached a contractual obligation to members of the Classes by violating the terms and conditions of Bluelink and Drive Score;

e. whether Defendants failed to comply with their own policies and applicable laws, regulations and industry standards relating to data collection and use; and

f. whether Plaintiffs and members of the Classes are entitled to actual damages, statutory damages, other injunctive relief, and/or punitive damages because of Defendants' wrongful conduct.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiffs and the Class Against Hyundai)**

100. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiffs and the Class have conferred substantial benefits on Hyundai through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the revenues and profits resulting from Hyundai's collection and sale and Plaintiffs' and Class members' individual driving histories to third parties Verisk and, indirectly, insurance companies.

102. Hyundai knowingly and willingly accepted and enjoyed these benefits.

103. Hyundai either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given through misrepresentation and deception. For Hyundai to retain the aforementioned benefits under these circumstances is inequitable.

104. Through deliberate violation of Plaintiffs' and the Class' privacy interests, and statutory and constitutional rights, Hyundai reaped benefits that resulted in Hyundai wrongfully receiving profits.

105. Equity demands disgorgement of Hyundai's ill-gotten gains. Hyundai has been unjustly enriched and will continue to be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

106. Plaintiffs and Class Members are without an adequate remedy at law.

107. As a direct and proximate result of Hyundai's wrongful conduct and unjust enrichment, the Plaintiffs and the Class are entitled to restitution from Hyundai and institution of a constructive trust disgorging all profits, benefits, subscription fees, and other compensation obtained by Hyundai through this inequitable conduct.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Contract**
**(In the Alternative, On Behalf of the Plaintiffs and the Class Against Hyundai)**

108. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

109. Alternatively, to the extent Hyundai successfully asserts that any terms of service form a binding contract that sufficiently defines the parties' rights regarding Hyundai's use of Plaintiffs' and Class members' driving data, thereby rendering a claim for restitution or unjust enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that Hyundai's conduct constitutes a breach of any such binding contract.

110. Specifically, to the extent that Hyundai's relationship with their users is governed by various terms of service and privacy statements, such as the Bluelink Service Subscriber Privacy Policy, the Hyundai Connected Services Agreement, and the Hyundai Motor America Privacy Statement, these documents set forth explicit promises by Hyundai that customers' personally identifiable, confidential information would not be shared with insurance companies without their consent.

111. Hyundai breached these promises by intercepting and collecting drivers' data and then packaging and selling that data to Verisk.

112. Plaintiffs and Class members fulfilled their obligations under the relevant contracts and are not in breach of any relevant contracts.

113. As a result of Hyundai's breach, they were able to acquire personal property of Plaintiffs and Class members and earn unjust profits.

114. To the extent that Plaintiffs and Class members agreed to any such contract, they also failed to receive the benefit of the bargain for which they contracted and for which they paid

valuable consideration in the form of (i) the personal information they agreed to share, which has ascertainable value to be proven at trial, and (ii) Bluelink subscription payments.

115. Plaintiffs, on behalf of themselves and Class members, seeks compensatory damages, consequential damages, and/or non-restitutionary disgorgement, including disgorgement of subscription fees, in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

## THIRD CAUSE OF ACTION
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiffs and the Class Against Verisk)**

116. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

117. Plaintiffs and the Class have conferred substantial benefits on Verisk through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the revenues and profits resulting from Verisk's acquisition and packaging of consumers' driving data for sale to insurance companies.

118. Verisk knowingly and willingly accepted and enjoyed these benefits.

119. Verisk either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given through misrepresentation and deception. For Verisk to retain the aforementioned benefits under these circumstances is inequitable.

120. Through deliberate violation of the Plaintiffs' and the Class' privacy interests, and statutory and constitutional rights, Verisk reaped benefits that resulted in Verisk wrongfully receiving profits.

121. Equity demands disgorgement of Verisk's ill-gotten gains. Verisk have been unjustly enriched and will continue to be unjustly enriched unless it is ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

122. As a direct and proximate result of Verisk's wrongful conduct and unjust enrichment, Plaintiffs and the Class are entitled to restitution from Verisk and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained Verisk through this inequitable conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

123. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

124. Plaintiffs and the Class hold, and at all relevant times held, a legally protected privacy interest in the personally-identifiable driving data that Defendants have scraped, packaged, and sold.

125. There is a reasonable expectation of privacy concerning Plaintiffs' and the Class' data, location information, and driving records, under the circumstances present.

126. The reasonableness of Plaintiffs' and the Class' expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiffs' and the Class' driving histories, through the use of dark patterns and otherwise. Plaintiffs' and the Class' expectation is particularly reasonable in light of the stated (deceptive) purpose of the Drive Score program and corresponding promises in documents and webpages.

127. Defendants' conduct constitutes and, at all relevant times, constituted a serious and offensive invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of—and allow third-party companies to take and make use of—Plaintiffs' and the Class's private and personally identifiable data and content. Defendants intentionally invaded Plaintiffs' and the Class' privacy interests by

intentionally designing a service to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

128. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

129. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiffs' and the Class' private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Drive Score program. Further, Defendants' conduct targeted Plaintiffs' and the Class' vehicles and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiffs' and the Class' highly private personally identifiable data and behavior.

130. Plaintiffs and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

131. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and Class members.

132. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs' and Class members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiffs and Class members as set forth above, and they are entitled to appropriate relief.

133. Plaintiffs and the Class seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious,

oppressive, and willful actions were calculated to injure Plaintiffs and the Class and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

134. Plaintiffs and the Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiffs' and the Class' full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiffs' and the Class' private and personally identifiable data to third parties; and to recall and destroy Plaintiffs' and the Class' private and personally identifiable data already taken in contravention of Plaintiffs' and the Class' right to privacy under the common law.

135. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiffs and the Class seek restitution and disgorgement for Defendants' violation of their privacy rights.

**FIFTH CAUSE OF ACTION**
**Violation of California's Constitutional Right to Privacy**
**(On Behalf of Plaintiffs and the California Subclass Against All Defendants)**

136. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

137. Plaintiffs and the California Subclass hold, and at all relevant times held, a legally protected privacy interest in the personally-identifiable driving data that Defendants have scraped, packaged, and sold.

138. There is a reasonable expectation of privacy concerning Plaintiffs' and the California Subclass' data, location information, and driving records under the circumstances present.

139. The reasonableness of Plaintiffs' and the California Subclass' expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiffs' and the California Subclass' driving histories, through the use of dark patterns and otherwise. Plaintiffs' and the California Subclass' expectation is particularly reasonable in light of the stated (deceptive) purpose of the Drive Score program and corresponding promises in documents and webpages.

140. Defendants' conduct constitutes and, at all relevant times, constituted a serious and offensive invasion of privacy in violation of Plaintiffs and the California Subclass' right to privacy under the California Constitution. Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of—and allow third-party companies to take and make use of—Plaintiffs' and the California Subclass' private and personally identifiable data and content. Defendants intentionally invaded Plaintiffs' and the California Subclass' privacy interests by intentionally designing a service to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

141. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

142. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiffs' and the California Subclass's private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Drive Score program. Further, Defendants' conduct targeted Plaintiffs' and the California Subclass' vehicles and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiffs' and the California Subclass' highly private personally identifiable data and behavior.

143. Plaintiffs and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

144. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and California Subclass members.

145. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs' and California Subclass members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiffs and California Subclass members as set forth above, and they are entitled to appropriate relief.

146. Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiffs' and the California Subclass' full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiffs' and the California Subclass' private and personally identifiable data to third parties; and to recall and destroy Plaintiffs' and the California Subclass' private and personally identifiable

data already taken in contravention of Plaintiffs' and the California Subclass' right to privacy under the common law.

**<u>SIXTH CAUSE OF ACTION</u>**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

147. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

148. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

149. Plaintiffs and the Class have, and at all relevant times had, a reasonable expectation of privacy in their driving histories and related private affairs.

150. The reasonableness of Plaintiffs' and the Class' expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiffs' and the Class' driving behavior and real-time location information, through the use of dark patterns and otherwise. Plaintiffs and the Class' expectations are particularly reasonable in light of the stated (deceptive) purpose of the Drive Score program and corresponding privacy promises in documents and webpages.

151. Defendants intentionally intruded upon Plaintiffs' and the Class' solitude, seclusion, and private affairs—and continue to do so—by intentionally designing the Drive Score program to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

152. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

153. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiffs' and the Class' private and personally identifiable data available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Drive Score program. Further, Defendants' conduct targeted Plaintiffs' and the Class' vehicles and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiffs' and the Class' highly private personally identifiable data and behavior.

154. Plaintiffs and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

155. Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiffs and the Class.

156. Plaintiffs and the Class seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Class and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

157. Plaintiffs and the Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiffs' and the Class' full and informed consent prior to the

collection of confidential driving information; stop transferring Plaintiffs' and the Classs private and personally identifiable data to third parties; and to recall and destroy Plaintiffs' and the Class' private and personally identifiable data already taken in contravention of Plaintiffs' and the Class' right to privacy under the common law.

158. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiffs and the Class seek restitution and disgorgement for Defendants' tortiously gotten profits from intruding upon the seclusion of Plaintiffs and the Class.

**SEVENTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**(On Behalf of Plaintiffs and the California Subclass Against All Defendants)**

159. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

160. The UCL, prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

161. Defendants violated, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

162. Defendants violated, and continue to violate, the "unfair" prong of the UCL because they misrepresented and omitted material facts regarding the characteristics, capabilities, and

benefits of the vehicles and the telematics systems they were equipped with. There is no societal benefit from such false and misleading representations and omissions, only harm.

163. While Plaintiffs and other California Subclass members were harmed by this conduct, Defendants were unjustly enriched. As a result, Defendants' conduct is "unfair" as it has offended an established public policy.

164. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

165. Defendants knew when vehicles were first sold and leased that they were equipped with telematics systems that collected and transmitted information concerning drivers and passengers to third parties, including driver behavior and real-time location information, and knew that the vehicles would transmit marketable and profitable information to risk analysis vendors like Verisk.

166. Plaintiffs and the California Subclass had no reason to know about any of these practices because there was no effective disclosure of the wide range of data that Defendants collected, packaged, and sold from Plaintiffs' and the California Subclass' vehicles.

167. The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants violated and continue to violate the "fraudulent" prong of the UCL by, among other things, prominently making the representations (which also constitute advertising within the meaning of Business & Professions Code § 17200) and omissions of material facts regarding the characteristics of the vehicles, the systems they were equipped with, and their data collection and dissemination activities.

168. Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

169. Plaintiffs and California Subclass members were deceived as a result of their reliance on Defendants' material representations and omissions, which are described above. Plaintiffs and other California Subclass members suffered injury in fact and lost money as a result of purchasing a deceptively advertised vehicle by having their privacy invaded; their location data collected and transmitted to third parties; paying more than they would have for their vehicles had they know that the vehicles are equipped with systems that collect and disseminate their location data; and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

170. Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their sale of Plaintiffs' and the California Subclass' data. Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

171. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data collection and sale practices and will not recall and destroy Plaintiffs' and the California Subclass' wrongfully collected private and personally identifiable data. Accordingly, injunctive relief is appropriate.

**EIGHTH CAUSE OF ACTION**
**Violation of the California False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiffs and the California Subclass Against Hyundai)**

172. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

173. The FAL prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

174. Hyundai's advertising is, and at all relevant times was, highly misleading. Hyundai's does not disclose at all, or does not meaningfully disclose, the manner through which it collects, aggregates, and sells drivers' confidential driving histories for millions of dollars in annual profits.

175. Reasonable consumers, like Plaintiffs and the California Subclass, are—and at all relevant times were—likely to be misled by Hyundai's misrepresentations. Reasonable consumers lack the means to verify Hyundai's representations concerning their data and content collection and use practices, or to understand the fact or significance of Hyundai's ability to market their driving history to the risk analysis and insurance markets.

176. Plaintiffs and the California Subclass have been harmed and have suffered economic injury as a result of Hyundai's misrepresentations. First, they have suffered harm in the form of diminution of the value of their private driving history. Second, they have suffered harm as a result of the invasion of privacy stemming from Hyundai's covert theft and sale of their private data that was never intended for public consumption. Third, they have been subjected to or will imminently be subjected to increased insurance rates as a result of Hyundai's unauthorized sale of their driving history.

177. Hyundai, as a result of their misrepresentations, has been able to reap unjust profits and revenues from sale of Plaintiffs' and the California Subclass' data, improvements to its driver risk models, and increased consumer demand for and use of Hyundai's other products. Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

178. Unless restrained and enjoined, Hyundai will continue to misrepresent their private and personally identifiable data collection and sale practices and will not recall and destroy Plaintiffs' and the California Subclass' wrongfully collected private and personally identifiable data. Accordingly, injunctive relief is appropriate.

**NINTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA"),**
**Cal. Pen. Code § 630, *et seq*.**
**(On Behalf of Plaintiffs and the California Subclass Against All Defendants)**

179. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

180. Cal. Pen. Code § 630 recognizes that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

181. As alleged above, Defendants engaged in illegal data practices by storing and tracking indefinitely the location information of car owners and their driving behavior, and thus determining their movements over time (and all other inferences derivable therefrom). This data collection without car owners' full and informed consent violated and continues to violate Cal. Pen. Code § 637.7.

182. Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic tracking device" means "any device attached to a vehicle or other movable thing that reveals its location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

183. In direct violation of this prohibition, and without the consent of Plaintiffs or California Subclass members, Defendants continued to record, store, and use the location and movement of Plaintiffs' and California Subclass members' vehicles and provide that information to third parties.

184. As described herein, Defendants utilized "electronic tracking devices" as defined by Cal. Pen. Code § 637.7(d), in that Defendants used "devices"—including the vehicles' own telematics systems, including, but not limited to, onboard diagnostics systems and built-in GPS functionality, which are mechanical or electronic equipment—attached to, and located within, each California Subclass member's vehicle (a "movable thing"), including Plaintiffs', to "reveal[] its location or movement by the transmission of electronic signals."

185. Defendants unlawfully used those electronic tracking devices "to determine the location or movement of a person"—namely, Plaintiffs and California Subclass members. Defendants engaged in such storage and tracking of each California Subclass member's movement, including Plaintiffs', after Defendants had affirmatively (but falsely) misrepresented that they would not store and track each California Subclass member's movement and transmit to third parties or omitted such information altogether.

186. Civil plaintiffs have a cause of action to enforce the provisions of CIPA and seek all forms of relief under the statute.

187. As a result of Defendants' violations of Cal. Pen. Code § 637.7, and pursuant to Cal. Pen. Code § 637.2, Plaintiffs and California Subclass members are entitled to the following relief:

a. a declaration that Defendants' conduct violates CIPA;

b. statutory damages and/or trebled actual damages;

c. injunctive relief in the form of, *inter alia*, an order enjoining Defendants from collecting and transmitting data of Plaintiffs and California Subclass members to third parties in violation of CIPA;

d. injunctive relief in the form of, *inter alia*, an order requiring Defendants to destroy all data created or otherwise obtained from Plaintiffs and California Subclass members; and

e. an award of attorneys' fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

**TENTH CAUSE OF ACTION**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.***
**(On Behalf of the Plaintiffs and the Class Verisk)**

188. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

189. Plaintiffs and the Class members are each a "person" and a "consumer" within the meaning of the Fair Credit Reporting Act ("FCRA"). 15 U.S.C. § 1681a(c).

190. Verisk is a "consumer reporting agency" within the meaning of FCRA. 15 U.S.C. § 1681a(f).

191. When a consumer reporting agency like Verisk prepares a consumer report, FCRA requires the agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual described in the report. 15 U.S.C. § 1681e(b).

192. Verisk failed to maintain reasonable procedures to maintain maximum possible accuracy regarding Plaintiffs and the Class members' driver behavior data before disseminating it to auto insurance carriers.

193. Auto insurance carriers who received this information from Verisk obtained and sold an inaccurate representation of Plaintiffs and the Class members through their driver behavior data.

194. The foregoing acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

195. As a result of each willful violation of FCRA, Plaintiffs and Class members are entitled to actual and statutory damages pursuant to 15 U.S.C. § 1681n(a)(1), punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Verisk.

196. As a result of each negligent noncompliance with FCRA, Plaintiffs and the Class members are entitled to actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Verisk.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request for themselves and all others similarly situated, the following relief:

a. an order certifying this action as a class action, defining the Class and California Subclass as requested herein, appointing the undersigned as Class Counsel, and finding Plaintiffs to be the proper representatives of the Class and California Subclass;

b. a permanent injunction and any other equitable relief as necessary to protect the interest of the Classes, including:

   i. an order declaring Defendants' conduct alleged herein unlawful and prohibiting Defendants from engaging in the wrongful and unlawful acts in the future; and

ii. requiring Defendants to develop and adopt appropriate security protocols to protect vehicle owners', lessees', and users' personal information, and privacy;

c. an award to Plaintiffs and the Class and/or California Subclass members of all recoverable damages, including statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits and subscription fees unlawfully obtained;

d. an award of attorneys' fees and costs recoverable under the claims pleaded herein, including any award of attorneys' fees and costs pursuant to Cal. Civ. Proc. Code § 1021.5; and

e. an order entering any other relief as is just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 6, 2024

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

Gary F. Lynch*
Connor P. Hayes*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 322-9243
gary@lcllp.com
connorh@lcllp.com

Norman E. Siegel*
J. Austin Moore*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com

*Attorneys for Plaintiffs and the Class*

**pro hac vice forthcoming*